UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
FREDERICK W. GUNDLACH,

                              Plaintiff,

          - against -                                    OPINION AND ORDER

INTERNATIONAL BUSINESS MACHINES                          No. 11-CV-846 (CS)
CORPORATION, IBM JAPAN, LTD, COGNOS K.K., and
JOHN DOE OR JANE DOES,

                              Defendants.
-------------------------------------------------------------------x

<u>Appearances:</u>
Frederick W. Gundlach
Denver Borough, PA
Pro Se *Plaintiff*

Allan S. Bloom
Erin Elizabeth Laruffa
Paul Hastings LLP
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

          Before the Court are the Motions to Dismiss of Defendants International Business

Machines Corporation ("IBM US"), (Doc. 33), and IBM Japan, Ltd. ("IBM Japan"), (Doc. 31),

(collectively, "IBM").  IBM US seeks dismissal of Plaintiff Frederick Gundlach's discrimination

claims under Federal Rule of Civil Procedure 12(b)(6) and on *forum non conveniens* grounds.

IBM Japan seeks dismissal of Plaintiff's breach of contract and Japanese Labor Law claims

under Federal Rules of Civil Procedure 12(b)(2), (4), (5), and (6), and on *forum non conveniens*

grounds.  For the following reasons, IBM US's Motion is GRANTED and IBM Japan's Motion

is DENIED without prejudice to renewal.

I.      **Background**

All of Plaintiff's factual allegations are accepted as true for the purposes of these Motions and construed in the light most favorable to Plaintiff.

A.      Plaintiff's Employment with Cognos K.K.

In February 2008, Plaintiff commenced employment as a financial consultant in Japan with Cognos K.K. ("Cognos"), a Japanese company.  (FAC ¶ 20 at 6; IBM US's Mem. 1.)[1] Plaintiff and Cognos signed an employment contract, dated February 25, 2008, which laid out the conditions of his employment and included the following terms:  (1) his job as a contracted employee would begin on February 25, 2008 and end on July 11, 2008, with the possibility of renewal if both parties consented; (2) he would perform accounting work as a financial consultant; (3) he would be based in Tokyo, Japan; and (4) Cognos could terminate him at any time with thirty days' advance notice.  (FAC Ex. C.)[2]  Plaintiff asserts that this contract

---

[1] "FAC" refers to Plaintiff's First Amended Complaint, filed July 29, 2011.  (Doc. 28.)  "IBM US's Mem." refers to Defendant International Business Machines Corporation's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Claims Against It.  (Doc. 34.)

[2] When deciding a motion to dismiss, the court is entitled to consider, among other things:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted).  Therefore, I will consider the exhibits attached to Plaintiff's FAC for the purposes of deciding these Motions.  I will also consider the employment contract between Plaintiff and IBM Japan, attached as Exhibit A to the Affirmation of Allan S. Bloom ("Bloom Aff."), (Doc. 35), because Plaintiff mentions and relies on this document in the FAC, (*see* FAC ¶¶ 38–40, 42–43 at 7–8).  Similarly, I will consider the correspondence with the Equal Employment Opportunity Commission ("EEOC") attached to Plaintiff's Memorandum of Law in Objection to Defendant International Business Machines Corporation's Motion to Dismiss ("P's IBM US Opp'n Mem."), (Doc. 37), because Plaintiff refers to those letters in the FAC, (*see* FAC ¶¶ 86–87 at 13).

contained a number of "irregularities" and "flaws," (*id.* ¶¶ 22, 26 at 6), and that it was not

ultimately honored by Cognos because, as an example, Cognos failed to pay him overtime, (*id.* ¶

25 at 6).

Shortly thereafter, Cognos's Finance Manager for Japan left the company, and on March

7, 2008, Plaintiff took over that role.  (*Id.* Ex. Q at 1; *id.* ¶ 27 at 6.)  Plaintiff asserts that this

switch in positions

> did not come with a written contract.  To memorialize the change in employment
> duties and status, specific terms were deleted from the February 25th contract.
> The monthly salary remained the same; the exchange was for 'regular' or what is
> also called permanent employment in Japan.  (In Japanese:  *kikan no sadame no
> nai*, "without end date," or *sei sha'in* status.)

(*Id.* ¶ 28 at 6.)  Plaintiff does not state who memorialized the changes.  The copy of the contract

attached as Exhibit C to the FAC has two provisions crossed out:  the one providing for a fixed

term of employment and the one specifying Plaintiff's supervisor.  The provision allowing

termination on thirty days' notice was not crossed out.  The cross-outs are accompanied by a

round red stamp, the significance of which is unexplained.  Plaintiff does not say who crossed

those provisions out or who supposedly agreed to permanent employment.  On March 17, 2008,

Plaintiff emailed two superiors at Cognos, Steve Gazzard and Representative Director Rohan

Persaud, requesting that those two provisions be removed.  (*See id.* Ex. D.)  Gazzard emailed

Persaud stating that he was "comfortable that we remove the end date – it has no real meaning

given that there is a notice period in the contract."  (*Id.*)  There is no allegation that Persaud

agreed or that a new contract was ever concluded.  According to Plaintiff, however, the March

2008 events converted him from a term-limited employee to a *sei sha'in*, or permanent,

employee.  (*Id.* ¶¶ 28–34 at 6–7.)

B.      Plaintiff's Employment with IBM Japan

IBM Japan is a "100% wholly-ow[n]ed subsidiary of defendant [IBM US]" and does business in Japan.  (*Id.* ¶¶ 1, 10 at 3–4.)  Plaintiff asserts that IBM acquired Cognos and that May 1, 2008 was set as the date for Cognos employees to transfer to IBM Japan, (*id.* ¶¶ 19, 33 at 6–7), but that the "management of IBM Japan, and in particular a John Doe or John Does, insisted that plaintiff not be transferred to IBM Japan," (*id.* ¶ 35 at 7).  Plaintiff attributes this sentiment to discrimination based on national origin.  (*Id.*)

Plaintiff was not transferred to IBM Japan as an employee but was given an employment contract.  (*Id.* ¶¶ 35, 43 at 7–8.)  According to Plaintiff, his contract with IBM Japan "did not honor the terms of the Cognos employment," (*id.* ¶ 38 at 7), in that it was term-limited, (*id.* ¶¶ 42–44 at 8).  Plaintiff construed this action as a "threat" by IBM Japan, intended to "cause a breach of plaintiff's employment agreement with Cognos" and induce Plaintiff to "accept unequal terms and conditions as were offered to the remaining Cognos employees, the overwhelming number of whom . . . were Japanese."  (*Id.* ¶ 39 at 8.)

On April 22, 2008, Plaintiff signed a fixed-term employment contract with IBM Japan for the period May 1, 2008 through January 31, 2009.  (*Id.* ¶ 69 at 11; IBM Japan's Mem. 2;[3] Bloom Aff. Ex. A.)  Sometime before January 31, 2009, Plaintiff was notified that his employment with IBM Japan would end on January 31, 2009, and he was subsequently terminated on that date.  (FAC ¶¶ 79–80 at 12.)  Plaintiff claims that after his termination, his "work was divided and given to employees, one or all of whom were at least 10 years younger than plaintiff," (*id.* ¶ 82 at 12), and attributes this action to age discrimination, (*id.* ¶ 84 at 12).  Plaintiff's permission to

---

[3] "IBM Japan's Mem." refers to Defendant IBM Japan Ltd's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Claims Against It.  (Doc. 32.)

work in Japan expired on November 17, 2010, and he returned to the United States on December 20, 2010. (*Id.* ¶ 96 at 14.) He currently resides in Pennsylvania.

C.    Procedural History

On October 8, 2008, Plaintiff contacted the EEOC via its website and notified them of his national origin and/or age discrimination claims. (*Id.* ¶ 76 at 12.) He informed the Human Resources departments of IBM US and IBM Japan of the same. (*Id.* ¶ 75 at 12.) On November 12, 2008, Plaintiff filed a formal charge with the EEOC alleging that he faced discrimination when IBM Japan accepted "all the other employees in the [Cognos] transfer as 'sei sha'in,'" or permanent employees, but made him "'keiyaku sha'in,'"—a contract employee with limited terms and conditions of employment. (*Id.* Ex. B at 1.) IBM US responded to the charge on February 23, 2009, contending that it could not be held responsible for the actions of IBM Japan because it did not "control" IBM Japan within the meaning of the relevant employment discrimination statutes. (*Id.* ¶ 86 at 13; P's IBM US Opp'n Mem. Attachment 1.) The EEOC sought a substantive response from IBM US, and on September 13, 2010, IBM US responded again, maintaining its initial defense and asserting that no discrimination had taken place. (FAC ¶¶ 88–89 at 13.) By letter dated November 2, 2010, the EEOC notified Plaintiff of its determination that no violation of federal law had been established and provided Plaintiff with a right to sue letter. (*Id.* Ex. A.) Plaintiff commenced this lawsuit by filing a complaint on February 7, 2011, (Doc. 1); he amended his complaint on July 29, 2011, (Doc. 28).

II.    **Discussion**

A.    Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

will not do." *Twombly*, 550 U.S. at 555 (internal citations and quotation marks omitted).  While

Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-

technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

In considering whether a complaint states a claim upon which relief can be granted, the

court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not

entitled to the assumption of truth," and then determines whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679.

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to

relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

"While *pro se* complaints must contain sufficient factual allegations to meet the

plausibility standard, [courts] read them with 'special solicitude' and interpret them 'to raise the

strongest arguments that they *suggest*.'" *Roman v. Donelli*, 347 F. App'x 662, 663 (2d Cir.

2009) (summary order) (emphasis in original) (quoting *Triestman v. Fed. Bureau of Prisons*, 470

6

F.3d 471, 474–75 (2d Cir. 2006)).[4]  Where, however, the plaintiff is an attorney, as Plaintiff is

here, he or she is not entitled to the same liberality afforded other *pro se* plaintiffs.  *See Cohen v.

Cnty. of Nassau*, No. 10-CV-5836, 2011 WL 2604345, at *1 n.1 (E.D.N.Y. June 29, 2011)

("Given that plaintiff is an attorney, his pleadings are not entitled to the degree of liberality

ordinarily given to *pro se* plaintiffs."); *Fenner v. City of N.Y.*, No. 08-CV-2355, 2009 WL

5066810, at *3 (E.D.N.Y. Dec. 21, 2009) ("Although *pro se* litigants are generally entitled to a

broad reading of their submissions because of their lack of familiarity with the law, that is not the

case with attorneys who have chosen to proceed *pro se*.  It is well settled in the Second Circuit

that since the reason for affording *pro se* litigants special deference is not present when the

litigant is an attorney, no special consideration is required.") (internal citation omitted).

> B.     Claims Against IBM US

Plaintiff alleges that IBM US discriminated against him on the basis of his national origin

and age.  IBM US contests the merits of Plaintiff's claims and also asserts that it cannot be held

responsible for the actions of IBM Japan because the federal laws at issue are not applicable to

employment actions taken by a foreign employer when the foreign employer is not "controlled"

by a U.S. company.  *See* 42 U.S.C. § 2000e-1(c)(2).  (*See also* IBM US's Mem. 3.)  I need not

determine whether IBM Japan is "controlled" by IBM US because Plaintiff has failed to state a

claim against IBM US for employment discrimination.

> 1.     Title VII—National Origin Discrimination

Plaintiff alleges that IBM Japan (and by association, IBM US) discriminated against him

on the basis of national origin when he was not offered permanent employment with IBM Japan

---

[4] Copies of all unpublished opinions cited herein will be sent to the *pro se* Plaintiff along with this Memorandum
Opinion and Order.

after having negotiated a permanent position at Cognos, but rather was relegated to a term-limited contract, while other, primarily Japanese employees, received the same terms of employment that they enjoyed at Cognos.  (FAC ¶¶ 35, 40, 44–48 at 7–8.)

To state a claim for national origin discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, a plaintiff must "demonstrate membership in a protected class, qualification for his [or her] position, an adverse employment action, and circumstances that support an inference of discrimination."  *Gorokhovsky v. City of N.Y.*, No. 10-CV-8848, 2011 WL 2019423, at *6 (S.D.N.Y. May 19, 2011).  At the pleading stage, a plaintiff need not establish a *prima facie* case of discrimination, but rather, need only plead sufficient facts to meet the general pleading requirements under *Twombly* and *Iqbal*.  *See Anderson v. Davis Polk & Wardwell LLP*, No. 10-CV-9338, 2012 WL 734120, at *2 (S.D.N.Y. Mar. 6, 2012) ("Reconciling *Swierkiewicz*, *Twombly*, and *Iqbal*, a complaint need not establish a *prima facie* case of employment discrimination to survive a motion to dismiss; however, the claim must be *facially plausible* and must give fair notice to the defendants of the basis for the claim.") (emphasis in original) (internal quotation marks omitted); *Lugo-Young v. Courier Network, Inc.*, No. 10-CV-3197, 2012 WL 847381, at *3–4 (E.D.N.Y. Mar. 13, 2012) (same).

Plaintiff's claim that he was treated differently from other former Cognos employees when he was not offered permanent employment, but rather a term-limited contract, culminating in his termination at the end of January 2009, fails.  First, Plaintiff does not plausibly allege that he suffered an adverse employment action.  Plaintiff does not dispute that his initial employment contract with Cognos was term-limited but claims that he became a permanent employee of Cognos when he took on the role of Finance Manager for Japan on March 7, 2008.  (FAC ¶¶ 26–28.)  This claim is not plausible.  Plaintiff did not receive a new contract to confirm this switch to

permanent employment status, and the documentary evidence at best demonstrates that one of Plaintiff's superiors merely stated that he felt "comfortable" removing the end date from Plaintiff's employment contract only because "it ha[d] no real meaning" anyway, given that Cognos could still terminate him at any time with thirty days' notice.  (*Id.* Ex. D.)  This exchange demonstrates, contrary to Plaintiff's argument, that while at Cognos even after March 2008, Cognos reserved the right to dismiss him and did *not* accord him permanent employee status. Continuation of the non-permanent status at IBM is thus not an adverse action.  Furthermore, Plaintiff's assertion that "[u]nder Japanese law, certain conforming writings are required **not** to confer 'regular employment,'" actually undermines his argument.  (P's IBM US Opp'n Mem. 12 (emphasis in original).)  Nothing in the record indicates that his initial employment contract with Cognos ceased to apply after March 7, 2008, notwithstanding the alleged removal of the termination date.  (*See* FAC Ex. D.)  Therefore, Plaintiff's employment was in fact governed by a conformed writing, indicating, under Plaintiff's logic, that he was not a "regular" employee. Finally, Plaintiff's assertion that the acquisition of Cognos took place in February 2008, so both his promotion to Finance Manager and any changes to his employment contract or status as a result thereof, occurred on IBM's watch, (*see* P's IBM US Opp'n Mem. 12), proves nothing, and in any event is undercut by his assertion that as of April 2008, Cognos may still have been hiring people without IBM Japan's knowledge, (*see* FAC ¶ 49 at 8).

Second, Plaintiff has failed to plausibly plead that the circumstances under which he went from Cognos to IBM Japan involved discriminatory conduct.  The thrust of Plaintiff's argument is that all non-American employees transferred from Cognos to IBM Japan "were given regular ('sei sha'in') employment status, which they had previously.  But plaintiff was not given the same."  (P's IBM US Opp'n Mem. 13.)  Plaintiff has not, however, pointed to a single fact that

supports the allegation that his treatment was based on his national origin.  The fact that Plaintiff

may have been the only American employed by Cognos until April 2008, (FAC ¶ 45 at 8),

without more—*e.g.*, a comment relating to Plaintiff's nationality or outward hostility towards

Americans[5]—does not raise an inference of discrimination.  If Plaintiff were similarly situated to

Cognos's other employees—*i.e.*, if they had contracts allowing their termination on thirty days'

notice—and they were all nevertheless given permanent employee status at IBM Japan, Plaintiff

might have a plausible argument that his not being accorded that status was based on his national

origin.  But absent facts supporting an allegation that he was similarly situated to the non-

American employees, no such inference arises.  *See Hilton v. Bedford Paving, LLC*, 769 F. Supp.

2d 92, 101 (W.D.N.Y. 2010) (complaint did not adequately plead claim for disparate treatment

discrimination because African-American plaintiff did not "plausibly allege that he was treated

differently than any similarly-situated white employee"); *Horne v. Buffalo Police Benevolent

Ass'n*, No. 07-CV-781, 2010 WL 2178813, at *8 (W.D.N.Y. May 28, 2010) (plaintiff failed to

allege violation of Title VII where complaint lacked facts suggesting action was taken on basis

of race or gender and did not provide examples of similarly situated officers being treated

differently); *Billue v. Praxair, Inc.*, No. 05-CV-170, 2007 WL 1231841, at *4 (D. Conn. Apr. 26,

2007) (to raise inference of discrimination, plaintiff may show that "defendant treated him less

favorably than a similarly situated employee outside his protected group," but in so doing,

plaintiff must ultimately "specifically show himself to be similarly situated in all material

---

[5] Plaintiff points to a Ninth Circuit case and congressional testimony from 1991 to show that IBM Japan's previous hiring practices were discriminatory.  (*See* FAC ¶¶ 58–60 at 9–10.)  Even if these excerpts affirmatively showed that IBM Japan discriminated in the past based on national origin, hiring incidents that occurred almost twenty years before the conduct at issue here and became notorious in no way create an inference that Plaintiff in fact suffered discrimination by IBM US.

respects to the individuals with whom he compares h[im]self") (internal quotation marks omitted).

Furthermore, the allegations in the FAC actually undermine Plaintiff's differential treatment argument. Plaintiff asserts that Laszio Domonkos, an American, was hired by Cognos in April 2008 as a permanent employee, (*see* FAC ¶ 49 at 8; *id.* Ex. R), and was among those transferred to IBM Japan as permanent employees on May 1, 2008, (*id.* ¶¶ 49, 51 at 8–9). Therefore, IBM clearly did not give permanent status to everyone except the American employees. Finally, Plaintiff's argument that out of five non-Japanese employees who were transferred from Cognos to IBM Japan, the only three remaining at IBM Japan for a "considerable length of time are of Asian country nationality (Korea, Philippines, Indonesia)," (*id.* ¶ 57 at 9)—the American (Domonkos) and an Australian left voluntarily, (*see id.* Ex. R)— fails to raise an inference of discrimination. That three non-Japanese employees lasted longer than two other non-Japanese employees says nothing about whether Plaintiff was discriminated against as an American when they all left Cognos and joined IBM Japan.

In sum, the FAC fails to set forth facts rendering plausible the conclusions that Plaintiff's status was downgraded upon IBM Japan's acquisition of Cognos or that any such action occurred because he was American. *See Ortega v. N.Y.C. Off-Track Betting Corp.*, No. 97-CV-7582, 1999 WL 342353, at *5 (S.D.N.Y. May 27, 1999) (complaint failed to raise inference of discrimination because it did not specify how complained-of actions were "motivated by, or g[a]ve rise to an inference of, discrimination" based on protected characteristic); *cf. Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (complaint must have enough factual content to allow court to draw reasonable inference that defendant is liable for alleged misconduct); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010)

11

("[B]ecause the allegations in the Complaint, however true, do not allow the court to infer any more than the mere possibility of misconduct, dismissal here is required.") (internal quotation marks omitted).  Accordingly, Plaintiff's Title VII claim is dismissed.

2.    ADEA Claim

Plaintiff alleges that IBM discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*  The ADEA provides that an employer may not "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  A complaint alleging age discrimination "must permit a court to infer that it is plausible that the plaintiff suffered an adverse employment action because of his age." *Anderson*, 2012 WL 734120, at *9.

Plaintiff has failed to plausibly plead that he was treated differently because of his age. Assuming for the sake of argument that Plaintiff is over forty years old and therefore entitled to the protections of the ADEA,[6] *see* 29 U.S.C. § 631(a); *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 243 (E.D.N.Y. 2010) ("class entitled to the statutory protection of the ADEA is limited to persons 40 years of age or older")—a fact which Plaintiff has not alleged— his claim still fails.  Plaintiff's only allegation of age discrimination is his statement that after he

---

[6] If Plaintiff was over forty years old when he was hired by IBM Japan—which, if he was over forty when he was terminated, is likely, given that he only worked for IBM Japan for nine months—this fact would also undermine his age discrimination claim.  *See Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07-CV-11316, 2008 WL 3861352, at *6 (S.D.N.Y. Aug. 19, 2008) (plaintiff's age discrimination claim "belied by her having been hired when she was forty-seven years old, and thus already a member of the protected class"); *Whyte v. Contemporary Guidance Servs., Inc.*, No. 03-CV-5544, 2004 WL 1497560, at *3 (S.D.N.Y. July 2, 2004) (allegation that defendant discriminates against older employees contradicted by plaintiff's allegation that he was hired when he was over forty, and thus already member of protected class).

was terminated, his work was divided among other personnel, at least one of whom was considerably younger.  (FAC ¶¶ 82, 84 at 12.)  This statement hardly shows that "IBM terminated plaintiff for reasons having to do with [his] age," (*id.* ¶ 84 at 12; *see* P's IBM US Opp'n Mem. 14), or that IBM considered his age in any way when it terminated him at the end of his fixed-term contract.[7]  *See Foster v. Humane Soc'y of Rochester & Monroe Cnty., Inc.*, 724 F. Supp. 2d 382, 390–91 (W.D.N.Y. 2010) (proposed amended complaint failed to state age discrimination claim where plaintiff alleged that she was over forty when fired, defendant fired two other upper level management employees over forty, and that after plaintiff was terminated, she was replaced by a woman in her thirties); *id.* at 391 (plaintiff's allegation that she was replaced by woman in her early thirties "is not enough to give rise to an age discrimination claim . . . .  If it were, then any time an ADEA-covered employer terminated an employee over age forty, the employer would be unable to replace that employee with someone younger, without exposing itself to potential liability for age discrimination.  That is not the law."); *Liburd*, 2008 WL 3861352, at *6 (allegation that plaintiff was replaced by younger employee after termination, "without more, is not enough to survive a motion to dismiss"); *Wilson v. Family Dollar Stores*, No. 06-CV-639, 2007 WL 952066, at *9 (E.D.N.Y. Mar. 29, 2007) (plaintiff's age discrimination claim failed where she did not allege her age, and did "nothing more than simply state that she was discriminated against based on her age and has failed to state any of the events or incidents that she believes form the basis of her . . . claim").

---

[7] Indeed, even the EEOC noted that "[w]hile age discrimination was indicated on [Plaintiff's] charge, [he] did not provide any specific allegations of age discrimination."  (FAC Ex. A.)

3.      Leave to Amend

Leave to amend should be "freely give[n] when justice so requires."  Fed. R. Civ. P.

15(a)(2); *see Zucker v. Five Towns Coll.*, No. 09-CV-4884, 2010 WL 3310698, at *3 (E.D.N.Y.

Aug. 18, 2010).  It is within the discretion of the district court to grant or deny leave to amend,

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and "[l]eave to amend,

though liberally granted, may properly be denied for:  undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal

quotation marks omitted).  Furthermore, a district court has no obligation to grant leave to amend

*sua sponte*.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to

have erred in failing to grant a request [to amend the complaint] that was not made . . . .").

At a pre-motion conference on July 15, 2011, the Court and the parties discussed the

deficiencies in Plaintiff's Complaint, including his failure to allege how other employees of

different national origin or age were treated differently.  Plaintiff was granted leave to amend his

Complaint and instructed to plead facts in support of these allegations.  Thus, because Plaintiff

has already had the opportunity to cure the deficiencies in his Complaint relating to his

discrimination claims, I decline to now *sua sponte* grant leave to amend.  *See Ariel (UK) Ltd. v.

Reuters Grp., PLC*, 277 F. App'x 43, 45–46 (2d Cir. 2008) (summary order) (district court did

not exceed its discretion in not *sua sponte* granting leave to amend where Plaintiff had already

amended complaint once and amendment would have been futile); *Payne v. Malemathew*, No.

09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided

14

notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny

leave to amend *sua sponte*.").

      C.    <u>Claims Against IBM Japan</u>

          1.    <u>Supplemental Subject-Matter Jurisdiction</u>

Having dismissed all claims over which this Court has original jurisdiction, I ordinarily

would decline to exercise supplemental jurisdiction over the non-federal claims. *See Kolari v.*

*N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (district court balances "the

traditional values of judicial economy, convenience, fairness, and comity[] in deciding whether

to exercise [supplemental] jurisdiction," but, "in the usual case in which all federal-law claims

are eliminated before trial, the balance of factors . . . will point toward declining to exercise

jurisdiction over the remaining state-law claims") (third alteration in original) (internal quotation

marks and citation omitted).  It appears to the Court, however, that although Plaintiff has asserted

only federal-question subject-matter jurisdiction under 28 U.S.C. § 1331, (FAC at 1), and may be

affirmatively disclaiming diversity jurisdiction, (*see* P's IBM Japan Opp'n Mem. 14),[8] diversity

of citizenship under 28 U.S.C. § 1332(a)(2) exists between Plaintiff and IBM Japan.  (*See* FAC

at 2 (Plaintiff resides in Pennsylvania; IBM Japan resides in Japan).)  Plaintiff shall have 14 days

from the date of this Order to advise whether he wishes to assert diversity jurisdiction.  If he does

not, the remaining claims will be dismissed without prejudice.  If he does, he shall file a second

amended complaint conforming to this Opinion and Order within 21 days thereafter.  In the

meantime I will consider the pending Motions on the assumption that Plaintiff will wish to assert

diversity jurisdiction.

---

[8] "P's IBM Japan Opp'n Mem." refers to Plaintiff's Memorandum of Law in Objection to Defendant IBM Japan, Limited's Motion to Dismiss.  (Doc. 40.)

2.      Personal Jurisdiction—New York's Long-Arm Statute

Plaintiff advances a claim against IBM Japan for breach of contract under Japanese

contract law and for violation of Japanese Labor Standards Law.[9]  (*Id.* at 15, 18.)  Before

considering the merits of these claims, I must consider whether jurisdiction exists over IBM

Japan.  *See Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).  At the

motion to dismiss stage, the plaintiff generally must make a *prima facie* showing by his

pleadings and affidavits that the court has jurisdiction over each of the defendants.  *See CutCo*

*Indus., Inc. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986) (at evidentiary hearing or trial,

plaintiff must demonstrate personal jurisdiction by preponderance of the evidence).  A federal

court sitting in diversity looks to the law of the state in which it sits to ascertain whether it may

exercise personal jurisdiction over a foreign defendant.  *See Bank Brussels Lambert v. Fiddler*

*Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).  In such cases, the court must first

determine if the forum's law would confer jurisdiction through its long-arm statute and then

decide if the exercise of such jurisdiction is permissible under the Due Process Clause of the

Fourteenth Amendment.  *Id.*

Plaintiff asserts that this Court has jurisdiction over IBM Japan under New York Civil

Practice Law and Rules ("CPLR") section 301.[10]  (FAC at 1; P's IBM Japan Opp'n Mem. 7.)

---

[9] The FAC is not clear, but it seems that Plaintiff argues that the contracts he had with Cognos and IBM Japan were
invalid, rather than breached, and that therefore by default Plaintiff was, under Japanese Labor Law, entitled to be
regarded as a permanent employee.  Plaintiff also apparently argues he was entitled to be paid for overtime work.

[10] Plaintiff explicitly states that he "did not put forth a Section 302 theory in the amended complaint—because
Section 301 applies—and so plaintiff will not respond here to Defendant's Section 302 arguments."  (P's IBM Japan
Opp'n Mem. 7.)  Accordingly, Plaintiff has abandoned any claim that the Court has jurisdiction over IBM Japan
under CPLR section 302.  *Cf. Kamanou v. Exec. Sec'y of Comm'n of Econ. Cmty. of W. African States*, No. 10-CV-
7286, 2012 WL 868700, at *3 (S.D.N.Y. Mar. 14, 2012) (plaintiff faces obligation, in response to defendant's
motion to dismiss, to "present arguments as to each of her causes of action.  Plaintiff's failure to do so constitutes
abandonment of those claims").

"Under the New York long-arm statute, general jurisdiction exists over non-residents 'doing business' in New York." *Arquest, Inc. v. Kimberly-Clark Worldwide, Inc.*, No. 07-CV-11202, 2008 WL 2971775, at *5 (S.D.N.Y. July 31, 2008) (citing N.Y. C.P.L.R. § 301). The Court may exercise jurisdiction over an "out-of-state defendant if the defendant engages in continuous and systematic business activities within New York," or in other words, does business "with a fair measure of permanence and continuity." *Id.* (internal quotation marks omitted). This standard is "stringent" and, "[a]t its core, . . . boils down to 'presence.'" *Id.* (quoting *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d 563, 567 (S.D.N.Y. 2006)). Factors that courts consider in determining a defendant's presence in the state include: "the existence of an office in New York; the solicitation of business in the state; the presence of bank accounts and other property in the state; and the presence of employees of the foreign defendant in the state." *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir. 1985).

Plaintiff has not alleged that IBM Japan has an office, bank accounts, property, or employees in New York, or that it solicits business here, and has therefore failed to make a *prima facie* showing of personal jurisdiction by this measure. Plaintiff instead attempts to demonstrate this Court's jurisdiction over IBM Japan through the "'mere department' and 'agency' doctrines of doing business in New York." (FAC at 1.) *See Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (Where a plaintiff alleges that a "foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the state. For New York courts to have personal jurisdiction in that situation, the subsidiary must be either an 'agent' or a 'mere department' of the foreign parent.") (internal citation omitted).

Plaintiff argues the reverse of the situation described in *Jazini*, attempting to show that Defendant IBM Japan is subject to jurisdiction here because it is a mere department or agent of its New York-based parent corporation.  Courts have, under certain circumstances, found this reverse jurisdictional theory plausible.  *See, e.g.*, *Sayles v. Pac. Eng'g & Constructors, Ltd. (PECL)*, No. 08-CV-676, 2010 WL 5334272, at *5 (W.D.N.Y. Dec. 20, 2010) (jurisdictional discovery issue relates to whether foreign defendants are mere departments of parent corporations with contacts in New York); *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F. Supp. 519, 521–22 (S.D.N.Y. 1975) (subsidiary subject to personal jurisdiction in New York because while "not 'physically' present in New York," it was "doing business in this State" due to relationship with parent).

a.   <u>Agency</u>

"To establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary does all the business which [the parent corporation] could do were it here by its own officials."  *Jazini*, 148 F.3d at 184 (alteration in original) (internal quotation marks omitted).  An "alternative[]" approach looks to "whether the subsidiary is carrying out its own business, or the business of the parent."  *Gallelli v. Crown Imports, LLC*, 701 F. Supp. 2d 263, 272 (E.D.N.Y. 2010).

Plaintiff's construction of agency jurisdiction is insufficient to establish personal jurisdiction over IBM Japan.  First, it casts the net too broadly.  Plaintiff argues that "[i]f the Japanese unit of IBM USA does things *in Japan* that IBM USA would have to do itself *in Japan*, if it [*sic*] not for the existence of IBM Japan," then the entities are thereby "undertaking a common activity" and "separate corporate existences are merely a formality."  (P's IBM Japan Opp'n Mem. 10 (emphasis in original).)  This logic, without other indications of a principal-

18

agent relationship, is problematic because it would seem to apply to nearly every parent-subsidiary relationship; a parent company creating a subsidiary to operate in a foreign country clearly intends that subsidiary to perform work in the foreign country that the parent might otherwise perform.  Yet it is not the case that every foreign subsidiary can be sued in New York—for any action occurring anywhere in the world—simply because its parent company is based in New York.  *See Jazini*, 148 F.3d at 184 (presence of New York entity alone not enough to establish related foreign entity's presence in state); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984) ("presence of a local corporation does not create jurisdiction over a related, but independently managed, foreign corporation").  Second, Plaintiff's argument flouts the general purpose behind personal jurisdiction.  New York's long-arm statute operates to establish jurisdiction over those out-of-state defendants who continually do business in New York to such a degree that they essentially maintain a presence in the state. *See Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir. 1983).  It was not intended as a tool to drag into court in New York all foreign subsidiaries of New York companies who otherwise lack any connection to New York, just because the foreign subsidiary's activities may benefit the New York parent.  Plaintiff certainly has not cited to cases upholding such a theory.[11] Accordingly, Plaintiff has not met his burden of establishing jurisdiction under this theory.

---

[11] The only case Plaintiff cites that might lend support to this theory is *Freeman v. Gordon & Breach, Science Publishers, Inc.*, 398 F. Supp. 519 (S.D.N.Y. 1975).  But *Freeman* cannot be read so broadly.  In that case, the court found that the parent and subsidiary were "integral part[s] of a united endeavor" and that "while two separate corporate entities have been established, only one commonly owned enterprise exists which, in order to function, must rely upon the joint endeavors of each constituent part."  398 F. Supp. at 522.  Therefore, while *Freeman* supports the reverse theory of jurisdiction generally, the case implements this theory in the limited situation where the parent and subsidiary were so intertwined that they were dependent on each other in order to function; it cannot be said to stand for the proposition that all foreign subsidiaries of New York companies can be sued in New York simply because their operations benefit the parent.

b.    Mere Department

"A subsidiary will be considered a mere department of [a parent corporation] where the [parent's] control over the subsidiary is pervasive enough that the corporate separation is more formal than real." *Gallelli*, 701 F. Supp. 2d at 271–72 (internal quotation marks omitted).  In deciding whether a foreign entity is a "mere department" of a New York corporation, courts look to four factors:  (1) common ownership; (2) "financial dependency of the subsidiary on the parent"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Volkswagenwerk*, 751 F.2d at 120–22.  While the first factor is "essential," *id.* at 120, "[e]ach of the [other factors] need not weigh entirely in plaintiffs' favor"; rather, "*Volkswagenwerk* necessitates a balancing process," *Advance Coating Tech., Inc. v. LEP Chem. Ltd.*, 142 F.R.D. 91, 95 (S.D.N.Y. 1992).

The parties do not dispute that the first factor is met.[12]  (P's IBM Japan Opp'n Mem. 11; IBM Japan's Reply Mem. 1–2.[13])  Plaintiff has not made a plausible showing with regard to the second factor.  He has alleged only that IBM US lent money to IBM Japan's parent so that IBM Japan could gain a tax benefit through a transaction with its parent.  (FAC ¶ 5 at 4; *id.* Ex. M.) While only "some measure of financial dependence" is required, *Advance Coating*, 142 F.R.D. at 95; *but see Gallelli*, 701 F. Supp. 2d at 273–74 ("Courts considering [financial dependency]

---

[12] IBM US does not own IBM Japan directly, but owns 100% of an intermediary company that, through another intermediary company, owns 100% of IBM Japan.  (*See* FAC Ex. F at 2.)  Thus, for the purposes of this analysis, common ownership is established.  *See Storm LLC v. Telenor Mobile Commc'ns AS*, 2006 WL 3735657, at *1–2, 13 (S.D.N.Y. Dec. 15, 2006).

[13] "IBM Japan's Reply Mem." refers to Defendant IBM Japan Ltd's Reply Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Claims Against It.  (Doc. 42.)

factor have held that a finding of financial dependency requires a showing that the subsidiary

would be unable to function without the financial support of the parent."), a simple transaction or

even a series of transactions that confers a benefit but is not necessary to the subsidiary's

functioning would not suffice to demonstrate dependence.  *See Reers v. Deutsche Bahn AG*, 320

F. Supp. 2d 140, 157 (S.D.N.Y. 2004) (financial dependency showing lacking where plaintiffs

alleged facts indicating "some measure of control over the broad financial policies of its

subsidiaries," but "have not clearly alleged dependency"); *Jerge v. Potter*, No. 99-CV-0312,

2000 WL 1160459, at *3 (W.D.N.Y. Aug. 11, 2000) ("Examples of situations in which financial

dependency has been found are no-interest loans, control of finances of subsidiary by parent and

financing of inventory by parent.") (footnotes omitted); *id.* (parent providing initial financing for

subsidiary insufficient to render subsidiary a "mere department"); *Advance Coating*, 142 F.R.D.

at 95 (financial dependency standard met where there were "guarantees to a prospective high

level employee of salary protection; . . . assurances to him that the company would be fully

funded by the parent; . . . grant[] of a below market value lease to the subsidiary . . . ; and the

provision of interest-free loans") (internal quotation marks omitted).

The third and fourth factors are unclear.  As to factor three, Plaintiff alleges that IBM US

and Japan "share corporate officials and managers," (P's IBM Japan Opp'n Mem. 12), "IBM

USA officials authorize changes in the subsidiary's executive personnel," (FAC ¶ 6 at 4),

personnel decisions are made in "'global' committees, which are set up and controlled by IBM

USA," (*id.*), and that "some of the senior management of [IBM Japan] were seconded there from

. . . the IBM parent in America," (P's IBM US Opp'n Mem. Attachment 2).  As to the fourth

factor, Plaintiff asserts that IBM US "controls the marketing and operating policies" of IBM

Japan, and that the companies have "standardized marketing and operational policies to the extent possible, as part of a . . . 'globally integrated enterprise' policy." (FAC ¶ 7 at 4.)

IBM Japan contests that Plaintiff has sufficiently demonstrated these factors, and while Plaintiff's arguments are fairly conclusory, IBM Japan has not actually provided any information about the company that would show *why* IBM US and Japan are distinct entities;[14] instead, it simply states that Plaintiff is incorrect and distinguishes the case law relied on by Plaintiff.[15]  To be sure, Plaintiff bears the burden of making out a *prima facie* case of personal jurisdiction.   But given that (1) Plaintiff has made a "sufficient start" at showing that the exercise of personal jurisdiction over IBM Japan might be proper, *Pandeosingh v. Am. Med. Response, Inc.*, No. 09-CV-5143, 2012 WL 511815, at *5 (E.D.N.Y. Feb. 15, 2012) (internal quotation marks omitted), which IBM has not refuted; and (2) jurisdictional allegations should be construed liberally, *see Mende*, 269 F. Supp. 2d at 251 (court should "construe jurisdictional allegations liberally and take as true uncontroverted factual allegations") (internal quotation marks omitted), and in light of Plaintiff's indirect requests for limited discovery, (*see* P's IBM Japan Opp'n Mem. 11, 13), I find that Plaintiff has made a showing sufficient to at least warrant limited discovery in order to determine whether personal jurisdiction over IBM Japan is proper.  *See Pandeosingh*, 2012 WL

---

[14] On a motion to dismiss, parties may submit affidavits to resolve jurisdictional disputes.  *See S. New England Tel. Co. v. Global NAPS Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (district court adjudicating motion to dismiss for lack of personal jurisdiction may rely on pleadings and affidavits or conduct evidentiary hearing); *Hunter v. Deutsche Lufthansa AG*, No. 09-CV-3166, 2012 WL 1059417, at *4 (E.D.N.Y. Mar. 28, 2012) (in deciding motion to dismiss for lack of personal jurisdiction, court may make determination on basis of affidavits); *Freeman*, 398 F. Supp. at 520 ("With regard to motions addressed to personal jurisdiction, it is proper for the Court to rely on affidavits to establish jurisdictional facts.") (internal quotation marks omitted).

[15] The information set forth in IBM US's February 23, 2009 EEOC response, (*see* P's IBM US Opp'n Mem. Attachment 1), is of the sort that could demonstrate to the Court that personal jurisdiction is lacking.  And indeed, if I could consider it for its truth, it might bring this case close to dismissal on jurisdictional grounds.  The information contained in the letter, however, was addressed to control for Title VII purposes and is not entirely on point for the analysis of the third and fourth factors in the "mere department" theory of jurisdiction, and therefore, dismissal at this time is not warranted.

511815, at *5 ("Where a plaintiff has failed to make a prima facie showing, but has made a sufficient start toward establishing personal jurisdiction, limited discovery may be appropriate.") (internal quotation marks omitted); *Ayyash v. Bank Al-Madina*, No. 04-CV-9201, 2006 WL 587342, at *6 (S.D.N.Y. Mar. 9, 2006) (limited discovery ordered before ruling on subject matter and personal jurisdiction where plaintiff had not made *prima facie* showing of jurisdiction, but had at least made a "sufficient start at making such a showing") (internal quotation marks omitted); *Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y. 2005) (balance of the *Volkswagenwerk* factors not clear, so, while plaintiff had not made *prima facie* showing of personal jurisdiction, discovery was appropriate); *cf. Hunter*, 2012 WL 1059417, at *4 ("In deciding a pre-trial motion to dismiss for lack of personal jurisdiction . . ., a district court has considerable procedural leeway, and may make its determination on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion.") (internal quotation marks omitted); *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 145 (E.D.N.Y. 2009) ("The Second Circuit has made clear . . . that a *prima facie* case is not absolutely necessary for a court to grant jurisdictional discovery.  Rather the showing necessary . . . is committed to the sound discretion of the district court on a case-by-case basis without bright-line limits.") (internal quotation marks and citation omitted).  Furthermore, limited discovery is particularly appropriate where, as here, the bulk of the relevant information is within the defendants' knowledge or possession.  *See Uebler*, 363 F. Supp. 2d at 506 (decision to permit discovery "bolstered by the fact that the facts necessary to establish personal jurisdiction lie within [Defendant's] exclusive knowledge").

3.     Personal Jurisdiction—Federal Rule of Civil Procedure 4(k)(2)

Plaintiff also asserts that this Court has jurisdiction over IBM Japan pursuant to Federal Rule of Civil Procedure 4(k)(2).  (P's IBM Japan Opp'n Mem. 15.)  Rule 4(k)(2) confers personal jurisdiction over a defendant in certain circumstances for a "claim that arises under federal law."  Fed. R. Civ. P. 4(k)(2).  Because both of Plaintiff's federal causes of action fail to state a claim on which relief can be granted, and in any event are not advanced against IBM Japan, jurisdiction over IBM Japan under Rule 4(k)(2) is inappropriate.

4.     *Forum Non Conveniens*

IBM Japan asserts that the FAC should be dismissed on *forum non conveniens* grounds. (IBM Japan Mem. 21.)  The decision to dismiss a case on *forum non conveniens* grounds lies wholly within the broad discretion of the district court.  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258 (1981); *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (*en banc*). There are three steps to the *forum non conveniens* inquiry:

> [T]he first level of inquiry pertains to determining whether the plaintiff's choice [of forum] is entitled to more or less deference.  A determination of what degree of deference is owed a plaintiff's choice of forum does not dispose of a *forum non conveniens* motion . . . .  [T]he next level of inquiry requires a court . . . to determine whether an adequate alternative forum exists.  When such is the case the court must go to the third step and balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant.

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003) (second alteration in original) (internal quotation marks and citations omitted); *accord Tel. Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 380 (S.D.N.Y. 2003).  The party seeking dismissal bears the burden of proof on all elements of its motion.  *Id.*

Although the arguments suggesting that this case ought to be adjudicated in Japan are quite compelling, IBM Japan has failed to show that an adequate alternative forum exists. Nowhere in its Memorandum of Law does IBM Japan fully grapple with this issue.  In its reply to Plaintiff's assertion that the statute of limitations has run in Japan for bringing a Japanese Labor Law claim, (P's IBM Japan Opp'n Mem. 25), IBM Japan merely asserts that "Japan provides a forum for these claims (including the Prefectural Labor Bureau, the Perfectural [*sic*] Labor Committee, and the court system in Japan)," (IBM Japan's Reply Mem. 9), without any nod to Plaintiff's statute of limitations argument or assurance that Plaintiff's claims can actually be brought in those forums.  *See Paisola v. GAP Adventures, Inc.*, No. 10-CV-8920, 2012 WL 1019585, at *2–4 (S.D.N.Y. Mar. 26, 2012) (adopting report and recommendation finding that no adequate alternative forum existed because claim would be time-barred under Canadian law); *Airflow Catalyst Sys., Inc. v. Huss Techs. GmbH*, No. 11-CV-6012, 2011 WL 5326535, at *3 (W.D.N.Y. Nov. 3, 2011) ("[P]roposed alternative fora have been ruled inadequate where . . . a statute of limitations bars the bringing of a case in a foreign forum that would be timely in the United States."); *In re Rezulin Prods. Liab. Litig.*, 214 F. Supp. 2d 396, 401 (S.D.N.Y. 2002) (conditioning grant of dismissal on *forum non conveniens* grounds on, among other things, defendants' waiver of right to assert statute of limitations defense in alternative forum). Therefore, IBM Japan has failed to fulfill its burden at this stage, although this does not foreclose the possibility of a successful *forum non conveniens* argument at a later stage.[16]

---

[16] In subsequent motion practice, IBM Japan might, for example, set forth the applicable Japanese statutes of limitations for Plaintiff's claims and indicate why they have not run, or, agree to waive a statute of limitations defense if the case were to be dismissed on the ground of *forum non conveniens*.

5.    Service of Process

Defendants' argument for dismissal based on improper service is unavailing.  Service of process must comport both with the statute under which service is effectuated as well as due process requirements.  In this case, the statutory prong concerns the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention").  *See Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986).  "As a ratified treaty, the [Hague] Convention is of course 'the supreme law of the land.'"  *Id.* (quoting U.S. Const. art. VI, cl. 2).  Under the Hague Convention, service is permitted in a number of ways—specifically, under Articles 5, 8, and 10.  *See id.* at 838–39.  Article 10 states that "[p]rovided the State of destination does not object, the present Convention shall not interfere with (a) the freedom to send judicial documents, by postal channels, directly to persons abroad." *Id.* at 839.  The Second Circuit has interpreted this to mean that where a country "has made no objection to the use of 'postal channels' under Article 10(a), service of process by registered mail remains an appropriate method of service . . . under the [Hague] Convention."  *Id.*; *see Rogers v. Kasahara*, No. 06-CV-2033, 2006 WL 6312904, at *3 (D.N.J. Oct. 16, 2006) ("The Second Circuit represents the other side of a lengthy debate" on the meaning of Article 10(a) and holds that "service of process by registered mail is valid in a country that has not opposed Article 10(a)," so long as litigants are provided with sufficient notice of the pending action).

As Plaintiff aptly points out, (*see* P's IBM Japan Opp'n Mem. 30), Japan, a signatory to the Hague Convention, clarified its position on Article 10(a) in 2003, specifying that it does not formally object to Article 10(a).  Courts in the U.S. have construed this to mean that "service of process by international mail to Japan is allowed under the Hague Convention."  *Levi Strauss & Co. v. Toyo Enter. Co.*, 665 F. Supp. 2d 1084, 1094 (N.D. Cal. 2009); *see Rogers*, 2006 WL

6312904, at * 5 ("[S]ervice of process by registered mail on the Japanese defendants was

proper.").  Thus, because Plaintiff served his Summons and Complaint on IBM Japan via

registered mail, (*see* Proof of Service, (Doc. 15); IBM Japan's Mem. 23–24), under the Hague

Convention and Federal Rule of Civil Procedure 4(f), IBM Japan was properly served, and the

FAC will not be dismissed on this ground.

6. <u>Failure to State a Claim</u>

   I may not consider a party's motion under Fed. R. Civ. P. 12(b)(6) without first

determining whether jurisdiction exists.  *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221

(2d Cir. 1963) (finding district court erred by ruling on question of failure to state a claim before

determining whether personal jurisdiction existed); *Mende*, 269 F. Supp. 2d at 251 ("Before

addressing Defendants' Rule 12(b)(6) motion to dismiss, the Court must first address the

preliminary questions of service and personal jurisdiction.").  Accordingly, I defer consideration

of the adequacy of the pleading of Plaintiff's Japanese breach of contract and Labor Law claims.

As Plaintiff has the opportunity to amend his FAC as to IBM Japan, however, he is advised that

he may wish to clarify exactly what breaches he is alleging, as well as the theory of his Labor

Law claim.

### III.   Conclusion

For the reasons stated above, Defendant IBM US's Motion is granted, and Defendant IBM Japan's Motion is denied without prejudice to possible renewal after jurisdictional discovery.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 31, 33).  As stated above, Plaintiff shall have 14 days from the date of this Order to advise whether he wishes to assert diversity jurisdiction.  If he does, he shall file a second amended complaint conforming to this Opinion and Order within 21 days thereafter.

In addition, the parties have recently submitted a series of letters to the Court raising a discovery dispute.  If Plaintiff advises that he wishes to pursue the case by asserting diversity jurisdiction, the case will be referred to Magistrate Judge Paul E. Davison to address that issue, and to supervise the limited jurisdictional discovery authorized by this Opinion and Order.

**SO ORDERED.**

Dated: May  1 , 2012
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

28